Filed 11/23/21  P. v. Alexander CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEROME AEMILIAN ALEXANDER,<br><br>    Defendant and Appellant. | B309903<br><br>(Los Angeles County Super. Ct. No. YA101453) |

APPEAL from an order of the Superior Court of Los Angeles County, Hector M. Guzman, Judge.  Affirmed as modified with instructions.

Bess Stiffelman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Appellant Jerome A. Alexander was with a companion who was suspected of purchasing a laptop by means of fraud. Just after the purchase took place, officers approached Alexander outside the store and asked for identification. Alexander referred to his wallet, which contained a false identification card. Alexander was charged with several offenses, including counterfeiting and identity theft. He moved to suppress the evidence found in his wallet on Fourth Amendment grounds, asserting that his detention or arrest was improper. The court denied the motion. Pursuant to a plea agreement, Alexander pled no contest to identity theft and the other charges were dismissed. He was sentenced to three years' probation.

On appeal, Alexander contends the trial court should have granted his motion to suppress evidence. We find the motion was properly denied. Alexander also asserts that amended Penal Code section 1203.1, subdivision (a),[1] effective January 1, 2021, requires that his probation term be reduced to two years. The Attorney General agrees the term is subject to reduction, but argues the case should be remanded to allow the People to withdraw from the plea agreement. We find remand is not warranted, and therefore reduce the term of probation and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 3, 2020, the Los Angeles County District Attorney (the People) filed an information charging Alexander with five felony counts: forgery of a driver's license (§ 470a, count

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1), counterfeiting a seal (§ 472, count 2), and three counts of identity theft (§ 530.5, counts 3-5). Alexander pled not guilty.

Alexander filed a motion to suppress all evidence from his wallet at the time of his arrest. He argued that the search was conducted without a warrant and was presumptively illegal, any pat down was illegal, and the evidence found was fruit of the poisonous tree. Alexander later filed a supplemental memorandum of points and authorities in support of his motion, asserting that no reasonable suspicion warranted a detention and there was no valid consent to a search. The People did not file a written opposition.

At the motion hearing on October 8, 2020, the People called as a witness Manhattan Beach Police Department (MBPD) detective Jason Gordon. He testified that on October 10, 2019, he and lieutenant Matt Sabosky responded to a radio call regarding possible fraudulent activity in progress at an Apple store. According to Gordon, Apple security suspected fraudulent activity by a man, Onyenaechi Oweazim, who had attempted to make transactions on "multiple days using multiple credit cards" at different Apple stores; he was "trying to use multiple Apple pay cards that were all getting declined," and the "names on the cards did not match." Apple security reported that Oweazim was again attempting to make a transaction inside the Manhattan Beach Apple store. The transaction was declined, and Oweazim left the store. An Apple security officer followed Oweazim outside, and saw him get into a Nissan Maxima in which a second person was sitting. After sitting in the vehicle with the other person for 30 to 40 minutes, Oweazim went back into the Apple store and successfully purchased a laptop for approximately $2,400.

Gordon testified that MBPD responded to the call; information was being transmitted over the police radios, and Gordon was on the phone with the Apple security officer. Some of the officers went into the mall to detain Oweazim while additional officers observed the vehicle outside. Once officers were informed over the radio that Oweazim had been detained inside the mall, Gordon and Sabosky approached Alexander, who was seated in the front passenger seat of the Maxima. Gordon testified that he and Sabosky told Alexander they were conducting an investigation, and Alexander immediately responded that he wanted to speak to an attorney. The officers asked Alexander to step out of the car. Gordon testified that he asked Alexander his name, and Alexander responded, "I would like to exercise my right to self-incrimination [*sic*]." Gordon told him that stating his name did not constitute self-incrimination, and Alexander replied, "My I.D. is in my wallet." Gordon testified, "I can't recall where his wallet was at the time, whether it was on the passenger seat of the vehicle or if it was removed and placed on top of the vehicle." When asked how he interpreted Alexander's statement about the wallet, Gordon testified, "I took that as I can go inside of his wallet to get his identification." Gordon stated that Alexander was detained at the time.

Gordon testified that when he opened the wallet, he found three identification cards. One card "appeared to be fraudulent based on the . . . feel of the identification card. The hologram was printed instead of an actual hologram. The photo appeared to be photo shopped [*sic*] and the text did not have the same text as an actual California driver's license." In addition, a check of the license "did not return to the information printed on that license.

It came back to a female." The other two identification cards, one from Texas and one from California, were genuine. Upon finding the false identification card, the officers arrested Alexander.

Gordon testified that the Maxima was searched incident to the arrest as a matter of course, and also because it appeared to be used in the crime due to the time Oweazim and Alexander spent inside the car. Officers also searched the remainder of Alexander's wallet incident to the arrest, and found fraudulent credit cards in the wallet.

On cross-examination, defense counsel asked whether Alexander had been handcuffed when he told officers his identification was in his wallet; Gordon could not recall. Defense counsel established that Alexander did not hand the officers his wallet or identification, and asked, "Lieutenant Sabosky got the wallet and handed it to you?" Gordon answered, "I believe so." Gordon could not recall the details about how and when the various licenses were "run," but he stated that the legitimate California identification card was run first, and he believed the fraudulent California identification card was also run at the scene. The Texas identification card was run later, after Alexander was arrested.

The defense called Sabosky to testify. He stated that he responded to the call regarding the fraud investigation at the mall, and "watched the car" that had been identified "until detectives completed their investigation" inside. Sabosky did not recall Alexander by appearance, but recalled that there was a person in the front passenger seat of the car. Sabosky did not recall when Alexander was handcuffed or how Gordon received the wallet before he looked inside it. Sabosky also could not recall whether Gordon asked him to run the identifications.

5

Sabosky agreed that the car was legally parked. Alexander did not testify or submit any additional evidence about the encounter.

The People argued that Alexander consented to the search. Defense counsel argued there was no reasonable suspicion regarding Alexander simply because he was with Oweazim. Defense counsel also argued that Alexander did not consent to a search and challenged the basis for the detention under the *Harvey-Madden* rule.[2] The court asked for additional argument "as to whether the detention was reasonable, in light of the detective's understanding of what was transpiring or what had transpired." Defense counsel again asserted that "the only thing suspicious about Mr. Alexander was that he was with Oweazim, not that he was suspected of being in any way tied to the fraud." The People argued that the "vehicle was going to be towed and searched regardless of pulling the defendant out of it."

The court remarked that consent was not at issue, because the officers could not recall the details about how they obtained the wallet. The court therefore stated, "I think we can pretty much all settle that it's a detention . . . . He's being detained; he's

---

[2] Under a line of cases arising from *People v. Harvey* (1958) 156 Cal.App.2d 516 and *People v. Madden* (1970) 2 Cal.3d 1017, "officers can make arrests based on information and probable cause furnished by other officers. [Citations.] These cases, however, require that when the first officer passes off information through 'official channels' that leads to arrest, the officer must also show basis for his probable cause. In other words, the so-called *Harvey-Madden* rule requires the basis for the first officer's probable cause must be 'something other than the imagination of an officer who does not become a witness.'" (*People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1553.)

being investigated, and the issue becomes, at least for the court, whether there was sufficient reasonable suspicion that Mr. Alexander was involved in criminal activity, and I think there is sufficient information, based on the testimony that this court has heard, that the officers had sufficient information to detain the defendant, Mr. Alexander." The court added, "[I]t would be incompetent police work if knowing what they knew" for the officers "not to go back to the car . . . and conduct further investigation." The court also noted that the officers waited for the transaction inside to be completed before approaching the car outside, and that the allegedly fraudulent activity had been going on for more than a day. Thus, the officers did a "short . . . investigative stop" in which Gordon "became aware of information that gave him probable cause to arrest." The court also noted that anything additional inside the wallet would have been discovered during the booking process. The court therefore denied the motion.

Pursuant to a plea agreement, on November 30, 2020 Alexander pled no contest to count 3, identity theft of the person whose information was on the fake identification card. The court sentenced Alexander to three years of formal probation and two days in county jail, plus 30 hours of community service. The remaining four counts were dismissed pursuant to the plea agreement.

Alexander timely appealed the denial of his motion to suppress evidence.

## DISCUSSION

Alexander asserts two arguments on appeal. First, he asserts there was no reasonable suspicion to detain him, so the search of his wallet was unlawful and therefore the motion to

7

suppress should have been granted. Second, he contends his probationary term must be reduced to two years under newly amended section 1203.1, subdivision (a), effective January 1, 2021. We address these arguments in turn.

A.     *Motion to suppress evidence*

The Fourth Amendment protects against unreasonable searches and seizures. (U.S. Const., 4th Amend.; *Terry v. Ohio* (1968) 392 U.S. 1, *People v. Hernandez* (2008) 45 Cal.4th 295, 299.) "'"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment."'" (*People v. Suff* (2014) 58 Cal.4th 1013, 1053.) Thus, "[w]e must accept factual inferences in favor of the trial court's ruling. [Citation.] If there is conflicting testimony, we must accept the trial court's resolution of disputed facts and inferences, its evaluations of credibility, and the version of events most favorable to the People, to the extent the record supports them." (*People v. Zamudio* (2008) 43 Cal.4th 327, 342.)

Alexander, making several factual assumptions not supported by the record, asserts he was approached by officers, refused to give his name, then "was ordered out of the car, handcuffed, and informed[ ] that his right against self-incrimination does not apply to his identification." He argues that "the natural inference from the testimony is that [the wallet] was obtained by one of the officers reaching into his pocket and removing the wallet while [Alexander] was in handcuffs." The Attorney General, on the other hand, asserts that Alexander's

8

initial reference to his wallet may have occurred while he was still seated in the car before any detention occurred, thus constituting consensual communication with the officers. The Attorney General agrees that once Alexander was asked to step out of the car the encounter became a detention, and asserts that the detention was reasonable in the context of MBPD's felony investigation.

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.) "Consensual encounters do not trigger Fourth Amendment scrutiny." (*Ibid.*) A detention "does not occur simply because a police officer approaches an individual and asks a few questions. . . . The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." (*Florida v. Bostick* (1991) 501 U.S. 429, 434.)

"A detention occurs when an officer intentionally applies physical restraint or initiates a show of authority to which an objectively reasonable person innocent of wrongdoing would feel compelled to submit, and to which such a person in fact submits." (*People v. Linn* (2015) 241 Cal.App.4th 46, 57.) "[T]he temporary detention of a person for the purpose of investigating possible criminal activity may . . . be based on 'some objective manifestation' that criminal activity is afoot and that the person to be stopped is engaged in that activity." (*People v. Souza* (1994) 9 Cal.4th 224, 230.) Thus, a "detention is reasonable under the

9

Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*Id.* at p. 231.) "The officer's subjective suspicion must be objectively reasonable," and "where a reasonable suspicion of criminal activity exists, 'the public rightfully expects a police officer to inquire into such circumstances "in the proper exercise of the officer's duties."'" (*People v. Wells* (2006) 38 Cal.4th 1078, 1083.)

The testimony does not make clear when the officers asked Alexander to step out of the car. Assuming for the sake of argument that the encounter constituted a detention rather than a consensual encounter, and therefore that the higher threshold of reasonableness was required, that threshold was met here; the totality of the circumstances provided an objectively reasonable basis for the detention. MBPD received information from Apple security officers that Oweazim had been attempting to make fraudulent transactions at multiple Apple store locations. After Oweazim's unsuccessful attempt to make a purchase at the Manhattan Beach store, he went outside, sat with Alexander in the car for 30 to 40 minutes, then went back inside and successfully purchased a $2,400 laptop. Alexander stayed in the car, presumably waiting for Oweazim to complete the transaction and return with the purchased goods. Under these circumstances, a detention to investigate the allegedly fraudulent activity was objectively reasonable.

Alexander argues there were no facts "particularized to" him to justify the detention, because only Oweazim was engaged in alleged fraud. He asserts he was only sitting in a car, and "there was nothing more than [Alexander's] association with

10

[Oweazim] and his presence in the car to justify the investigation." We disagree. Oweazim's multiple attempts to make fraudulent transactions, and his ability to make a successful transaction after sitting with Alexander in the car for 30 to 40 minutes, provided a reasonable basis for the officers' suspicion that Alexander may have been involved in Oweazim's criminal activity.

We are unpersuaded by Alexander's contention that "mere association does not constitute particularized suspicion justifying a detention," or the cases he cites in support. (See *Ybarra v. Illinois* (1979) 444 U.S. 85, 91 ["a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person"]; *People v. Hester* (2004) 119 Cal.App.4th 376, 390 [an officer's "assumptions, beliefs, opinions and guesswork" that served as the basis for detaining all occupants of a car were "simply not the objective facts and permissible inferences required by the Fourth Amendment"]; *People v. Pitts* (2004) 117 Cal.App.4th 881, 887 ["'a person cannot be detained for mere presence in a high crime area'"].) Here, Alexander was not detained simply because he was with Oweazim. Instead, the two were together while Oweazim engaged in an ongoing process of attempting to complete suspicious transactions. Under the totality of the circumstances, the detention of Alexander was reasonable.

Alexander also asserts he had a right to refuse to identify himself to officers, the officers did not have a right to demand identification, and any information Alexander provided to officers was not consensually given. However, "[a]sking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without

11

implicating the Fourth Amendment. '[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.'" (*Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County* (2004) 542 U.S. 177, 185; see also *People v. Vibanco* (2007) 151 Cal.App.4th 1, 13.)

Alexander relies on several federal civil cases criticizing vagrancy laws that allowed individuals to be arrested for failing to identify themselves. The Ninth Circuit rejected these laws because "as a result of the demand for identification, the [vagrancy] statutes bootstrap the authority to arrest on less than probable cause." (*Lawson v. Kolender* (9th Cir. 1981) 658 F.2d 1362, 1366, aff'd (1983) 461 U.S. 352; see also *Martinelli v. City of Beaumont* (9th Cir. 1987) 820 F.2d 1491, 1494.) The reasoning in those cases is inapplicable here, where officers requested identification in the scope of investigating criminal activity, and Alexander was not arrested for failing to produce identification.

Alexander further argues that "[r]eaching into [his] pocket while he was handcuffed is a full search and requires probable cause." This argument is not supported by the record. Neither Gordon nor Sabosky could recall the sequence of events regarding handcuffing Alexander and obtaining the wallet. Although he disputes how the wallet was obtained, Alexander does not dispute that he told officers that his identification was in his wallet. As noted above, we draw factual inferences in favor of the trial court's ruling and accept the trial court's resolution of disputed facts. (*People v. Zamudio, supra*, 43 Cal.4th at p. 342.)

Moreover, even assuming Alexander's assumed sequence of events is correct, handcuffing a suspect briefly during an investigation does not convert a detention into an arrest.

12

"'[T]here is no hard and fast line to distinguish permissible investigative detentions from impermissible de facto arrests. Instead, the issue is decided on the facts of each case . . . .' [Citations.] Important to this assessment, however, are the 'duration, scope and purpose' of the stop." (*People v. Celis* (2004) 33 Cal.4th 667, 674-675.) The Supreme Court held in *Celis* that "stopping a suspect at gunpoint, handcuffing him, and making him sit on the ground for a short period, as occurred here, do not convert a detention into an arrest." (*Id.* at p. 675; see also *People v. Stier* (2008) 168 Cal.App.4th 21, 27 ["handcuffing a suspect during a detention does not necessarily transform the detention into a de facto arrest"].) Here, even if Alexander was handcuffed briefly while officers checked his identification, he has not demonstrated that the detention constituted a de facto arrest.

Thus, the detention was reasonable in light of the totality of the circumstances, and officers were entitled to ask Alexander about his identity during the detention. Alexander's motion to suppress was correctly denied.

B. *Probation term*

The trial court sentenced Alexander on one count to three years' formal probation and two days in county jail, plus 30 hours of community service. The remaining four counts were dismissed pursuant to the plea negotiation. After Alexander was sentenced, Assembly Bill No. 1950 (2019-2020 Reg. Sess.) modified section 1203.1 effective January 1, 2021, to reduce felony probation terms to two years.[3] (§ 1203.1, subd. (a).) Alexander contends his

---

[3] Section 1203.1, subdivision (a) states in part, "The court, or judge thereof, in the order granting probation, may suspend the imposing or the execution of the sentence and may direct that the suspension may continue for a period of time not exceeding

13

probationary term accordingly must be reduced to two years.  The Attorney General agrees that Alexander is entitled to have his probation term reduced.[4]

However, the parties disagree as to the appropriate remedy.  Alexander contends that "[s]imply striking the portion of the probationary term that exceeds two years is the most efficient means" of addressing the statutory change, and therefore remand is unnecessary.  The Attorney General, on the other hand, asserts that the case must be remanded to allow the People to withdraw from the plea agreement in light of the changed law.

The Attorney General relies on the Supreme Court's decision in *People v. Stamps* (2020) 9 Cal.5th 685 (*Stamps*).  In that case, while the defendant's appeal was pending, "a new law went into effect permitting the trial court to strike a serious felony enhancement in furtherance of justice (Pen. Code, § 1385, subd. (a)), which it was not previously authorized to do." (*Stamps*, *supra*, at p. 692.)  The defendant asserted that "the court is authorized to exercise its discretion to strike the enhancement but otherwise maintain the plea bargain," but the Supreme Court rejected that contention.  (*Ibid.*)  The court noted that "long-standing law limits the [trial] court's unilateral authority to strike an enhancement yet maintain other provisions of the plea bargain."  (*Id.* at p. 701, citing *People v. Kim* (2011)

two years, and upon those terms and conditions as it shall determine."  The two-year limitation does not apply to certain offenses not at issue here. (See § 1203.1, subd. (m).)

[4] The change to section 1203.1 applies to cases not yet final on appeal.  (See *In re Estrada* (1965) 63 Cal.2d 740; *People v. Sims* (2021) 59 Cal.App.5th 943, 961; *People v. Quinn* (2021) 59 Cal.App.5th 874, 883.)

14

193 Cal.App.4th 1355, 1361.) The court stated, "If the court indicates an inclination to exercise its discretion under section 1385, the prosecution may, of course, agree to modify the bargain to reflect the downward departure in the sentence such exercise would entail. Barring such a modification agreement, 'the prosecutor is entitled to the same remedy as the defendant— withdrawal of assent to the plea agreement . . . .'" (*Stamps, supra*, 9 Cal.5th at p. 707, quoting *Kim, supra*, 193 Cal.App.4th at p. 1362.)

After *Stamps* was decided, the First District, Division Four decided *People v. France* (2020) 58 Cal.App.5th 714, rev. granted Feb. 24.2021, S266771 (*France*). In that case, the court considered the effect of Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill 136), which amended section 667.5 and rendered the defendant, France, no longer subject to a one-year sentence enhancement imposed under that section. The Attorney General argued that "the proper form of relief would be to remand the case to the trial court so that the People would have the option of either accepting the original sentence without the one-year enhancement or abandoning the plea agreement and reinstating the original charges against France." (*France, supra*, 58 Cal.App.5th at p. 723.) The defendant, on the other hand, argued that the revision "entitle[d] him to have the one-year prior prison term enhancement stricken with no other changes to his negotiated sentence." (*Id.* at p. 717.)

The majority opinion in *France* distinguished *Stamps* and found remand was not warranted. It reasoned that under section 1385, at issue in *Stamps*, "it is ultimately a trial court that chooses whether an enhancement is eliminated," which "implicates the prohibition on a trial court's ability to unilaterally

modify an agreed-upon sentence." (*France, supra*, 58 Cal.App.5th at p. 728.) By contrast, under Senate Bill 136, at issue in *France*, "the Legislature itself has mandated the striking of affected prison priors by making the enhancement portion of France's sentence illegal." (*Id.* at pp. 728-729.) The court noted that "there is nothing in Senate Bill 136's text or legislative history that runs contrary to the view that Senate Bill 136 requires a court to strike the one-year enhancements while leaving the remainder of the plea bargain intact." (*Id.* at p. 729.) The court therefore modified the sentence by striking the one-year enhancement under section 667.5, and otherwise affirming the judgment. (*Id.* at p. 730.)[5]

In his reply brief, Alexander urges us to reject the Attorney General's position and follow the reasoning of *People v. Stewart* (2021) 62 Cal.App.5th 1065, rev. granted June 30, 2021, S268787 (*Stewart*), in which the First District, Division Two considered whether the reasoning in *Stamps* or *France* was more applicable to the probation changes in section 1203.1. As in this case, Stewart was sentenced to three years' probation and argued that the change to section 1203.1 entitled him to a reduction to two years. (*Id.* at pp. 1068-1069.) The Attorney General asserted that "the prosecution must be given an opportunity to either agree to

---

[5] Justice Pollak dissented from the majority opinion, stating, "I conclude that Senate Bill 136 does not empower a court to unilaterally alter the plea bargain struck between the prosecution and the defendant for imposition of a four-year sentence by reducing the sentence to three years without the People's consent. Upon defendant's application to strike the one-year enhancement, I believe the prosecution must be given the option of agreeing to a three-year term or withdrawing from the plea agreement." (*Id.* at p. 731 (dis. opn. of Pollak, J.).)

this new term or withdraw from the plea agreement pursuant to which probation was imposed." (*Id*. at p. 1074.)

The *Stewart* court stated, "As applied to the issues in the present case, we find the analysis of the *France* majority more persuasive. As the majority explained, *Stamps* addressed a situation in which the new law gave the trial court discretion to strike an enhancement but did not require it to do so, thus placing directly in the trial court's hands the decision whether to alter a term of the plea bargain. *Stamps* therefore had no occasion to consider the effect on a plea bargain of retroactive application of a law through which the Legislature directly affected a plea bargain by rendering one of its terms invalid." (*Stewart, supra*, 62 Cal.App.5th at p. 1077.) By contrast, the change imposed by the Legislature in section 1203.1 "'has a direct and conclusive effect on the legality of existing sentences,'" similar to the statutory change in *France*. (*Id.* at p. 1078, quoting *France, supra*, 58 Cal.App.5th at p. 729.) The court therefore modified the term of probation to two years, and otherwise affirmed the judgment. (*Stewart, supra*, 62 Cal.App.5th at p. 1079.)

Here, Alexander asserts that *Stewart* applies, and therefore his probationary period should be reduced as a matter of law without remanding the case to allow the People to withdraw from the plea agreement. The Attorney General did not cite or distinguish *Stewart* in the respondent's brief. We agree with the reasoning of *Stewart*, and find that remand is not warranted under the circumstances of this case.

## DISPOSITION

We modify the order granting probation by reducing the term of probation to two years, and direct the trial court to

amend the minute order to reflect the two-year term.  In all other respects, we affirm the judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

MANELLA, P. J.

WILLHITE, J.

18